## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-cr-4 |
| | ) | |
| JAMES R. CASEY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) WITH MEMORANDUM OF LAW AND REQUEST FOR EXPEDITED BRIEFING

On behalf of Defendant James R. Casey (Mr. Casey), the undersigned respectfully moves this Court to grant him compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order that the remainder of Mr. Casey's sentence be served on home confinement as a condition of supervised release. This motion should be granted for "extraordinary and compelling reasons," specifically Mr. Casey's particular vulnerability to COVID-19 due to his incarceration, age, and underlying health issues.

Mr. Casey is 76 years old and suffers from serious health issues, including coronary heart disease and high blood pressure, among other conditions.  If he contracts COVID-19, he faces a significant risk of death or severe illness.  Mr. Casey is not a danger to the community, and his immediate release under these circumstances adheres to the mandates of 18 U.S.C. § 3553(a), particularly in light of the cataclysmic events of the current pandemic.  Counsel for Mr. Casey asks the Court to consider this motion on an expedited basis, as the risk of the pandemic multiplies exponentially with each passing day.

## I.      Factual Background

On September 26, 2018, Mr. Casey pled guilty to the sole count of the criminal information, which charged him with conspiracy to violate the Lacey Act, in violation of 18 U.S.C. § 371 and 16 U.S.C. § 3372(d) and 16 U.S.C. § 3373(d)(3)(A)(ii).  On January 9, 2019, Casey was sentenced to 45 months' imprisonment to be followed by three years of supervised release.  ECF No. 25.  Mr. Casey's release date from the Bureau of Prisons is March 28, 2022.  *See* Fed. Bur. of Prisons, Find an Inmate, available at https://www.bop.gov/inmateloc/.

According to the PSR as well as recent medical records from the Bureau of Prisons, Mr. Casey suffers from coronary heart disease, hypertension, hyperlipidemia, severe osteoarthritis of his right knee and gout. The Centers for Disease Control and Prevention ("CDC") singled out these conditions as creating a higher risk for severe illness from COVID-19.[1] Just this week, the Wall Street Journal reported on newly released data showing that cardiovascular disease is the "deadliest so far of the underlying conditions that make some people more vulnerable to the ravages of Covid-19."[2]  "People with cardiovascular disease face more life-threatening complications and a substantially higher risk of death from the new coronavirus, according to data and reports from

---

[1] *See* Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19): Groups at Higher Risk for Severe Illness, available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 14, 2020).

[2] Betsy McKay, *Heart Conditions Prove Especially Dangerous for Covid-19 Patient* Wall St. J. (Apr. 13, 2020), *available at* https://www.wsj.com/articles/heart-conditions-prove-especially-dangerous-for-covid-19-patients-11586683801.  Betsy McKay, *Heart Problems Raise Death Risk*, Wall St. J. (Apr. 13, 2020) (attached as Exhibit 1).

doctors in several countries, and even those with simple high blood pressure are being urged to take extra care against infection." *Id.*

Mr. Casey is currently incarcerated at the Federal Correctional Institution at Petersburg Low – specifically at the minimum security satellite camp.  As of the writing of this motion, there are currently no confirmed cases of COVID-19 at this facility (according to the Bureau of Prisons website).  However, the rate at which COVID-19 is spreading throughout federal prisons in this country is devastating.  Attorney General Barr has found that the COVID-19 pandemic has created "emergency conditions" in the Bureau of Prisons (BOP), where the virus has now spread to over 500 people, and killed 10 of them. As of April 16, 2020, there were 449 confirmed cases among federal inmates and 280 confirmed cases among staff.  See Fed. Bur. of Prisons, Open COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/.   On April 10, 2020, there were 91 positive cases among inmates and 50 positive cases among staff.  Id.  These numbers demonstrate just how quickly the virus is infecting and killing individuals in the BOP.  At least one of the inmates who died in the BOP was 76 years old, like Mr. Casey.[3]  By the time COVID-19 hits Petersburg, it will be too late for Mr. Casey.

Just prior to the filing of this motion, on or about April 10, 2020, Mr. Casey submitted and filed an administrative relief request with the warden of FCI Petersburg - Low seeking compassionate release on the same grounds as submitted herein. Because of

---

[3] Eric Heisig, *Third Inmate Dies at Ohio Federal Prison as Fallout from Coronavirus Outbreak Continues*, Cleveland.com (Apr. 4, 2020), *available at* https://www.cleveland.com/court-justice/2020/04/third-inmate-dies-at-ohio-federal-prison-as-fallout-from-coronavirus-outbreak-continues.html.

the urgency of the spread of COVID-19, both nationally and within the federal prison system, we respectfully ask the Court to waive the 30-day waiting period for any response by the warden.  By the time a response is received, it could be too late.[4]

## II.    This Court Should Waive the 30-day Waiting Period Ordinarily Applied to Compassionate Release Motions.

Because of the urgency of the spread of COVID-19, this Court should waive the thirty-day waiting period for filing a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  Requiring Mr. Casey to wait a minimum of 30 days to exhaust his administrative remedies is futile under the circumstances and could lead to irreparable harm.  Mr. Casey faces an increased risk of contracting the virus because of the conditions of confinement in prison, where social distancing is impossible and disease spreads fast. If Mr. Casey contracts COVID-19, which is likely if and when it is introduced to the facility, he faces grave risk of serious illness or death.  He is 76 years old and he has serious heart problems.  Waiting a minimum of 30 days to exhaust administrative remedies completely defeats the purpose of this motion, which is seeking urgent relief. In these dire and unusual circumstances, the Court can and should waive the administrative exhaustion requirement in § 3582.

On December 21, 2018, the First Step Act became law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on

---

[4] In the alternative, we respectfully ask that the Court stay any grant of compassionate release until May 10, 2020, which is 30 days from the date Mr. Casey submitted his request for compassionate release to the Warden.

extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Accordingly, the statute ordinarily requires that a defendant must either (a) fully exhaust administrative rights to appeal the BOP's failure to move for compassionate release itself, or (b) wait until 30 days have elapsed from a warden's receipt of the defendant's request for compassionate release, before a court may grant such a motion filed by the defendant. *See* § 3582(c)(1)(A).

But neither of these alternatives—administrative exhaustion or a 30-day waiting period, whichever occurs sooner—are jurisdictional prerequisites to judicial review of a defendant's compassionate release motion.  Over the last decade, "the Supreme Court has taken new care to distinguish between truly (*i.e.*, non-waivable) jurisdictional rules and ordinary case-processing rules." *United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015). As the Supreme Court has explained, "[a] rule is jurisdictional '[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional.'  But if 'Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional.'" *Gonzalez v. Thaler*, 565 U.S. 134, 141-42 (2012) (citations omitted).  Put differently, a statutory exhaustion or waiting period requirement is not jurisdictional if the statute "does not contain 'jurisdictional language'—language dictating that judicial review be obtained within a prescribed time and manner before a

particular court." *See Stewart v. Iancu*, 912 F.3d 693, 700 (4th Cir. 2019) (discussing 180 day waiting period in Title VII). "Simply because [a] [] waiting period is 'cast in mandatory language' does not render it jurisdictional." *Id.* at 701.

The Seventh Circuit in *Taylor* made two observations about § 3582 that speak to whether the statute imposes jurisdictional requirements. First, "§ 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment." 778 F.3d. at 671. Second, the court emphasized that subsection (c) as a whole is not phrased in jurisdictional terms. *Id.* ("Nor is subsection (c) phrased in jurisdictional terms. It begins: 'The court may not modify a term of imprisonment once it has been imposed,' with exceptions then specified. *Since Congress has not framed the issue in terms of jurisdiction, the statutory indicators point against jurisdictional treatment*.'" *Id.* (emphasis added)). Just as the Fourth Circuit concluded with respect to a 180-day waiting period in Title VII, Congress did not include a "clear statement" referencing jurisdiction in § 3582(c)(1)(A), by "explicitly 'tag[ging]' a procedural bar 'as jurisdictional'" in connection with a court's authority to consider a defendant's motion. *See Stewart*, 912 F.3d at 700. As such, § 3582(c)(1)(A) does not impose a jurisdictional prerequisite on this Court.

Furthermore, the text of § 3582(c)(1)(A) and the context in which it was enacted in the First Step Act strongly supports the conclusion that it "incorporate[s] standard administrative law exceptions" to administrative exhaustion requirements. *Cf. Ross v. Blake*, 136 S. Ct. 1850, 1858 n.2 (2016) (noting that statutory exhaustion requirements may incorporate well-settled administrative law exceptions to exhaustion). Indeed, courts

have long recognized that a statutory exhaustion requirement that "on its face, contains no exceptions," may in fact permit "exceptions to the exhaustion doctrine." *See, e.g., Wash. Ass'n for Television & Children v. F.C.C.*, 712 F.2d 677, 681 (D.C. Cir. 1983).

As an initial matter, "§ 3582(c)(1)(A) does not contain an exhaustion requirement in the traditional sense." *United States v. Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020). In particular, "the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *Id.*; *cf. Stewart*, 912 F.3d at 699 (noting that Title VII provision at issue was "not a paradigmatic exhaustion requirement"). Accordingly, the plain text of the statute "allows a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3. Congress thus "recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial." *Id.* Furthermore, "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release." *Id.* The text of the statute thus strongly suggests that the relatively modest procedural hurdle in the statute should not hinder or delay judicial consideration in circumstances that require urgent judicial consideration of a defendant's motion. *Id.*

A second unique feature of the so-called "exhaustion" requirement in § 3582(c)(1)(A) is also relevant to the analysis. Typically, an exhaustion requirement

demands that a prospective litigant try to obtain from the administrative agency the substantive relief he ultimately desires before he asks a court for that relief. Under such a scheme, "[a] complaining party may be successful in vindicating his rights in the administrative process"; thus, "[i]f he is required to pursue his administrative remedies, the courts may never have to intervene." *McKart v. United States*, 395 U.S. 185, 195 (1969).

Here, by contrast, this Court retains at all times the exclusive power to order the defendant's compassionate release. The only question is whether the motion seeking that court order will be filed by the Director of the Bureau of Prisons or by Mr. Casey himself. In either case, this Court will be involved. So it is not just that the statute allows a defendant to come to court before the agency has rendered a final decision. *See Haney*, 2020 WL 1821988, at *3. It is that—even when the agency reaches a final decision—the parties will necessarily end up before this Court. Judicial consideration of the matter is *inevitable* under the scheme Congress established in § 3582(c)(1)(A). This is another reason to conclude that Congress would not have contemplated that its statutory claims processing rule would be used to delay a judge's *inevitable* consideration of an urgent matter.

Moreover, as discussed below, 35 years after compassionate release was originally enacted, Congress amended § 3582(c)(1)(A) in the First Step Act precisely because of the BOP's failure to exercise its statutory authorization to move for compassionate release. Given this statutory history, § 3582(c)(1)(A) should be construed to incorporate "standard administrative law exceptions" to exhaustion. In sum, this Court possesses "discretion to waive the exhaustion requirement where, as here, strict enforcement of the 30-day

waiting period would not serve these Congressional objectives. And in the extraordinary circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly best served by permitting [Mr. Casey] to seek relief before the 30-day period has elapsed." *Haney*, 2020 WL 1821988, at *4; *see also United States v. Perez*, 1:17cr513, ECF No. 98 (S.D.N.Y. Apr. 1, 2020) ("exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."); *United States v. Jones*, 3:11cr249, ECF No. 47 at 2-3 (E.D. Va. Apr. 3, 2020) ("Here, the Court finds administrative exhaustion futile because directing Jones to seek administrative remedies through the Bureau of Prisons would moot the immediate relief Jones seeks. Given Jones's unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate.").

III.     **Sentence Reduction Authority**

This Court has authority to order Mr. Casey's immediate release under the compassionate release statute in 18 U.S.C. § 3582(c)(1)(A)(i), as modified by the First Step Act.  Section 3582(c)(1)(A)(i) states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" When enacting § 3582(c) as part of

the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* 28 U.S.C. § 992(a)(2) (the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[ ] . . . 3582(c) of title 18").

The Sentencing Commission followed the directive and issued a policy statement. Importantly, though, this policy statement has not been updated to reflect changes made by the First Step Act of 2018.[5]  For example, the statement says that a court can order a compassionate release only "[u]pon motion of the Director of the Bureau of Prisons." *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505 at *4 (M.D.N.C. June 28, 2019). This is no longer the case. Now, after the passage of the Act, a motion for modification may be brought directly by a prisoner.  *See* 18 U.S.C § 3582(c)(1)(A).

The Commission's current policy statement further sets forth the following factual considerations for determining whether compassionate release is appropriate: (i) the

---

[5] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A). The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three. *Id*. Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  U.S.S.G. § 1B1.13, Application Note 2.  In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id*.

Mr. Casey seeks relief under the catch-all provision in subsection (iv) that permits relief for "extraordinary or compelling reasons" other than or in addition to those listed by the Commission.  Although he has not served 75 percent of his term of imprisonment, he is over 65 years old (age 76) and suffers from serious physical deterioration related to aging, as set forth in subsection (ii).  To the extent that this catch-all provision limits relief to grounds identified by the Bureau of Prisons, it is inconsistent with the First Step Act, which broadened the accessibility of compassionate release by enabling defendants to move the court for relief.

Several district courts have embraced this position. In *United States v. Kepa Maumau*, 2:08-cr-758-TC, ECF No. 1746 (D. Utah, Feb. 18, 2020), the court undertook an extensive analysis of district court decisions from across the country on this issue, noting that no Court of Appeal has addressed it yet.  The court observed that it is "join[ing] the majority of other district courts" in concluding that it has the discretion to provide the defendant with relief, "even if his situation does not directly fall within the Sentencing Commission's current policy statement." *Id.* at 7.  "Under the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an 'extraordinary and compelling reason' to reduce a sentence." *Id.* at 7-8; *see also United States v. Redd*, Case No. 1:97cr6, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)").

As noted above, the First Step Act's amendment to § 3582(c)(1)(A) also reflects congressional intent to diminish the BOP's control over compassionate release by permitting defendants to file sentence reduction motions directly with the sentencing court. The BOP's administration of the compassionate release program has long been the subject of criticism. The Department of Justice's Office of the Inspector General has repeatedly found that the program results in needless and expensive incarceration and is administered ineffectively. Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013) ("The BOP does

not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."). Aside from the expense and inefficiency, the human costs of the BOP's stinting view of compassionate release has been documented by prisoner advocates. Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons* (Nov. 2012).

With the enactment of the First Step Act, the authority shifted to this Court to decide whether extraordinary and compelling reasons warrant a sentence reduction in this case without deference to any administrative agency. In the context of compassionate release, courts around the country have considered a defendant's vulnerability to COVID-19 in deciding whether there is an "extraordinary and compelling reason" in favor of compassionate release.[6]   Here, Mr. Casey is asking this Court to similarly find

---

[6] *See, e.g., Haney*, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020) (granting compassionate release – discussed above); *United States v. Tran*, 8:08-cr-197, ECF No. 405 (C.D. Cal. Apr. 10, 2020) (ordering compassionate release in light of COVID-19);  *United States v. Smith*, No. 1:12-cr-133, ECF No. 197 (S.D.N.Y. Apr. 13, 2020) (granting release; finding exhaustion waivable and waived); *United States v. Sawicz*, Case No. 08-cr-287, ECF No. 66 (E.D.N.Y. Apr. 10, 2020) (releasing child pornography offender based on "[t]he COVID-19 outbreak at FCI Danbury, combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension"); *United States v. United States v. Trent,* Case No. 16-cr-178, ECF No. 106 (N.D. Cal. Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United*

*States v. Clagett*, Case No. 2:97-cr-265, ECF No. 238 (W.D. Wash. Apr. 9, 2020) (granting stipulated motion for compassionate release in light of severe risks posed by COVID-19); *United States v. Plunk*, Case No. 3:94-cr-36 (D. Alaska Apr. 9, 2020) (granting compassionate release in light of COVID-19); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (granting compassionate release and waiving exhaustion requirement for defendant at serious risk from COVID-19); *United States v. Hansen*, 2020 WL 1703672 (E.D.N.Y. Apr. 8, 2020) (COVID-19 pandemic and medical problems justifies 7-month reduction in sentence); *United States v. Oreste*, Case No. 1:14-cr-20349, Dkt. No. 200 (S.D. Fla. Apr. 6, 2020) (compassionate release); *United States v. Zukerman*, No. 1:16-cr-194, ECF No. 116 (Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19: "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic"); *United States v. Foster*, No. 1:14-cr-324-02, ECF No. 191 (M.D. Pa. Apr. 3, 2020) (noting "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Edwards*, No. 6:17-cr-3, ECF No. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (concluding that "[i]n light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home") *United States v. Hernandez*, No. 18-cr-20474, ECF No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release); *United States v. Jepsen*, 2020 WL 1640232 (D. Conn. Apr. 1, 2020) (waiving exhaustion and granting compassionate release to immunocompromised defendant); *United States v. Perez*, No. 1:17-cr-513, ECF No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271, ECF No. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (compassionate release in light of severe risk posed to defendant by COVID-19); *United States v. Gonzalez*, No. 2:18-cr-232, ECF No. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) granting compassionate release for defendant with elevated risk of dire health

that that his particular vulnerability to COVID-19 is an "extraordinary and compelling reason" to grant compassionate release.

### IV. The COVID-19 outbreak presents an extraordinary and compelling circumstance that warrants compassionate release for Mr. Casey, who is at risk of death due to his age and preexisting health conditions.

A. COVID-19 presents a national and global emergency.

It is difficult to overstate the impact the rapid spread of COVID-19 has had across the globe.  In the United States, at least 48 states have declared states of emergency and the President declared a national emergency.[7]  The number of confirmed cases in the United States is currently at 632,548, and that number is widely considered to be understated because of the unavailability of tests.  More than 27,000 people have died in

---

consequences due to the current COVID-19 outbreak); *United States v. Muniz*, Case No. 4:09-cr-199, ECF No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382, ECF No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Powell*, No. 1:94-cr-316, ECF No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant).

[7] President Donald J. Trump, "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak" (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamati on-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited Apr. 1, 2020).

this country, more than half of which have been in the last few days.[8]  Experts have warned that even with the extreme measures currently in effect—containment zones in a number of communities, social distancing orders, the mandatory closures of non-essential businesses and activities—the number of deaths could top 100,000. On March 29, 2020, the president of the United States declared that social distancing restrictions would continue at least through April 30, 2020.

The exponential rate of coronavirus infection is unparalleled.  The first case of coronavirus in Virginia was announced on March 7, 2020.[9]  To date, the state has amassed 6,889 confirmed cases of the virus, with 208 deaths.[10] In a five-day period between March 25 and March 30, Virginia experienced a 261 percent increase in new confirmed cases of COVID-19.[11]

In response to this public health crisis, Governor Ralph Northam declared a State of Emergency in Virginia on March 12, 2020.[12] On March 23, 2020, Governor Northam closed non-essential businesses and all K-12 schools, banned gatherings of ten or more

---

[8]  *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (April 6, 2020), at   https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html   (last visited April 15, 2020).

[9]  *US Marine in Virginia Tests Positive for Coronavirus*, CNN Politics (March 7, 2020), at https://www.cnn.com/2020/03/07/politics/us-marine-coronavirus-virginia/index.html (last visited April 4, 2020).

[10]  *COVID-19 in Virginia*, Virginia Department of Health (March 30, 2020), at http://www.vdh.virginia.gov/coronavirus/ (last visited April 16, 2020).

[11] *Id.*

[12] *Governor Northam Declares State of Emergency, Outlines Additional Measures to Combat COVID-19* (March 12, 2020), at https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-853537-en.html (last visited April 4, 2020).

people, and discouraged all non-essential travel outside the home.[13]   In the following

seven days, confirmed cases in Virginia rose from 254 cases to 1,020 cases—a 401 percent

increase.[14]  On March 30, 2020, Governor Northam issued a statewide stay-at-home order,

which directed all Virginians to remain at home except for extremely limited

circumstances until June 10, 2020.[15] Virginians may leave their homes for very limited

purposes including to obtain food, necessary medicine, and exercise, but must observe

strict social distancing rules.  Anyone not complying with the stay-at-home order will be

subject to criminal prosecution.[16]

Courts too have taken substantial steps to respond to this crisis.  This Court, in

particular, has issued a series of general orders recognizing the serious risk posed by

COVID-19 and implementing unprecedented measures to minimize the spread of the

virus, such as restricting visitors and closing portions of the courthouse, postponing

deadlines, continuing all criminal matters, and tolling the speedy trial clock, for example.

Federal courts around the country are granting release to criminal defendants pre-trial

and pre-sentencing, in addition to allowing delayed self-reports to prison, all in response

---

[13] *Governor Northam Orders Statewide Closure of Certain Non-Essential Businesses, K-12 Schools* (March 23, 2020), at https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855292-en.html (last visited April 4, 2020).

[14] *See supra* note 6.

[15] *Governor Northam Issues Statewide Stay at Home Order* (March 30, 2020), at https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702-en.html (last visited April 4, 2020).

[16] *Virginia Gov. Northam Issues Stay-At-Home Order*, NBC4 (March 30, 2020), at https://www.nbcwashington.com/news/coronavirus/virginia-gov-northam-issues-stay-at-home-order/2258486/ (last visited April 4, 2020).

to the COVID-19 pandemic.[17]  As noted in lengthy footnote six above,  courts around the country have considered the danger of COVID-19 a factor in finding "extraordinary and compelling reasons" to grant compassionate release.

Finally, this Court has recognized that the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and compelling reason" for compassionate release.  *United States v. Redd*, Case No. 1:97-CR-00006-AJT, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020).  Although this decision did not address the coronavirus (it was not at issue), it speaks somewhat to the issue presented here: if Mr. Casey is required to remain incarcerated during this pandemic, he faces both an increased risk of contracting COVID-19 and a highly elevated risk of dying from it.  These are enhanced punishments that were not foreseen or intended at sentencing.

---

[17]  *See, e.g., United States v. Meekins*, Case No. 1:18cr222, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to the extraordinary danger that COVID-19 poses to individuals in detention); *United States v. Davis*, No. 1:20cr9, 2020 WL 1529158, at *9 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community); *United States v. Hector*, No. 2:18cr3, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to individuals in prison).

B. <u>Mr. Casey faces a significantly higher risk of contracting COVID-19 because of the conditions of confinement, his advanced age, and his serious preexisting health conditions.</u>

Conditions of confinement create the ideal environment for the transmission of contagious disease.[18]  "Prisons are petri dishes for contagious respiratory illnesses."[19] Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily, without screening.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[20]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[21]

Given what we know about COVID-19, the BOP's attempts to contain the infection seem futile.  Coronavirus is highly contagious.  On average, one person with the

---

[18]   Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[19]   *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[20]   "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[21] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityof PrisonsandJailstoCOVID19Explainer.pdf.

coronavirus will infect between two to three other individuals.[22]   But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[23]

Internationally, prisons have proven ripe for the rapid spread of COVID-19.  In China, officials confirmed 500 cases of coronavirus in prisons.[24]   Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[25]   Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[26]   As the chairwoman of the New York City Board of Correction has urged, "The best path forward to protecting the community of

---

[22] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3 (last visited March 31, 2020).

[23] "*Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States,*" (Mar. 2, 2020), at https://bit.ly/2W9V6oS (last visited March 31, 2020).

[24] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT (last visited March 31, 2020).

[25] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697 (last visited March 31, 2020).

[26] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7 (last visited Mar. 31, 2020).

people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[27]

While many jails have halted in-person visitation, "there is no way to stop the daily flow of guards, teachers, food service and healthcare workers.  Someone is certain to bring the virus in and take it back out while they are asymptomatic."[28]  Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the CDC strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least six feet of space between people, and social distancing.  Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals are bunked with cellmates, sharing a toilet and sink with cellmates and a common shower with at least a dozen or more other people. Courts have acknowledged these concerns. *See, e.g. United States v. Kennedy*, Case No. 18-20315, Case No. 2020 WL 1493481 at *2 (E.D. Mich. Mar. 27 2020) (quoting CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities") (Mar. 23, 2020)) and noting that challenges to control of COVID-19 include "low capacity for patient volume, insufficient

---

[27] Michael Rezendes and Robin McDowell, *38 positive for coronavirus at Rikers, NYC jails*, The Associated Press (Mar. 22, 2020), at https://apnews.com/54dbc9d47f62cf0c0240314310cfe909 (last visited March 31, 2020).
[28] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration (last visited March 31, 2020).

quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing).").

Mr. Casey is at-risk in several ways: he is 76 years old, he lives in a confined environment, and he has serious heart problems as well as other serious medical conditions. As noted in the PSR, at the time of sentencing 15 months ago, Mr. Casey suffered from high cholesterol and a slow heart rate. In September 2017, he had a heart attack and soon after underwent bypass surgery for five blocked arteries.  After his surgery, Mr. Casey suffered from additional complications requiring hospitalization and adjustment of his heart medication.  In August 2018, Mr. Casey underwent another heart procedure, which revealed three-vessel atherosclerotic coronary artery disease.  The PSR notes that he was taking at least five different heart medications and that he is allergic to the blood thinner Coumadin.  In addition to his heart issues, Mr. Casey underwent a hip replacement in 2010 and is in need of another hip replacement.  It was also noted that Mr. Casey walks with a noticeable limp.  *See* PSR, ECF No. 23 at ¶¶ 51-57.

Mr. Casey's numerous serious health problems have only worsened since his incarceration.  At this time, Mr. Casey suffers from the following serious medical conditions:

- Coronary heart disease
- Hypertension
- Hyperlipidemia - an abnormally high concentration of fats or lipids in the blood

- o This condition increases fatty deposits in arteries and the risk of blockages.
- Severe osteoarthritis of his right knee
  - o chronic right knee pain
- Hip (left) replacement in 2010
- Gout
- Non-combat injury while in U.S. Army stationed in Vietnam – accident involving APC track vehicle – punctured lung and 13 cracked ribs

Since he entered the Bureau of Prisons, Mr. Casey has received consistent medical treatment and takes multiple medications. For this heart disease and problems, the BOP medical staff recommended that Mr. Casey be seen by a cardiologist, Dr. K. Dave. Due to an abnormal stress test, Dr. Dave recently recommended that Mr. Casey have a cardiac catherization. This procedure has been put on hold due to the coronavirus situation.

Mr. Casey is especially at risk for severe illness or death from COVID-19 because of his age and preexisting health conditions. According to the CDC, "older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."[29] The CDC lists the following risk categories: (1) people 65 years and older; (2) people who live in a nursing home or long-term care facility; (3) chronic lung disease or moderate to severe asthma; (4) serious heart conditions; (5) conditions that can cause a person to become immunocompromised (including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other

---

[29] *See* CDC, "Groups at Higher Risk for Severe Illness," *available at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions .html (last visited April 2, 2020).

immune weakening medications); (6) severe obesity; (7) diabetes; (8) chronic kidney disease and who are undergoing dialysis; and (8) liver disease. *Id.*

More specifically, the CDC says Mr. Casey's "serious heart condition" may put him at "high-risk for severe illness from COVID-19."[30] That is putting it mildly: a Harvard Medical School publication reported that "[a]bout 10% of patients with pre-existing cardiovascular disease (CVD) who contract COVID-19 will die, compared with only 1% of patients who are otherwise healthy."[31] Mr. Casey's age of 76 is also a concern. The CDC highlights the risk to those over 65, but again, this is putting it mildly. The Intensive Care National Audit and Research Centre in London reports that 68.7 percent of those between the ages of 70-79 admitted to critical care with COVID-19 died in critical care.[32]

In addition to his advanced age and heart condition, it is also worth noting that Mr. Casey's right knee is a source of constant pain and discomfort. As noted above, this is because he has severe osteoarthritis of his right knee. The Bureau of Prisons' medical records note that Mr. Casey "has an altered gait" and that he "lean[s] to the left when he walks" due to his knee condition. This record further notes that Mr. Casey "is starting to

---

[30] *Id.*

[31] Dara K. Lee Lewis, MD, *Harvard Health Blog, "How does cardiovascular disease increase the risk of severe illness and death from COVID-19?,"* Harvard Health Publishing (Apr. 2, 2020), at https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-2020040219401 (last visited Apr. 11, 2020). Another Harvard publication explains that "cardiovascular disease" is a broad term that includes all heart diseases. Harvard Men's Health Watch, "Cardiovascular disease and heart disease: What's the difference?" (Apr. 2, 2020), https://www.health.harvard.edu/heart-health/cardiova scular-disease-and-heart-disease-whats-the-difference (last visited Apr. 11, 2020).

[32] *ICNARC report on COVID-19 in critical* care, ICNARC (Apr. 4, 2020), *available at* https://www.icnarc.org/Our-Audit/Audits/Cmp/Reports (last visited Apr. 15, 2020).

[lose] balance as a result of his altered gait." *Id.* Mr. Casey is in need of a knee replacement which has been recommended.

## V.     Releasing Mr. Casey is appropriate because he is not a danger to the community, and it would comport with the § 3553(a) sentencing factors.

In determining whether Mr. Casey's sentence should be reduced based on an "extraordinary and compelling reason," this Court must also consider whether Mr. Casey presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).  *See* U.S.S.G. § 1B1.13(2). Finally, under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate.

In addressing a defendant's potential danger to the community, courts have found that granting the release of a criminal defendant in certain circumstances better ensures public safety by decreasing the prison population.  In a recent decision, the district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis."  *See, e.g., United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary.").[33]

---

[33] *See also United States v. Mclean,* No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have

Mr. Casey does not pose a danger to the community.  He is a nonviolent offender.

Aside from the underlying offense, he has no criminal history whatsoever.  And he is 76

years old, making him statistically unlikely to recidivate.[34]  The Bureau of Prisons even

recently concluded on December 11, 2019 that Mr. Casey's recidivism risk level was

"minimum."

Mr. Casey also has a viable release plan.  He will return to Poquoson, Virginia to

live with his wife of over 50 years, one of his daughters and his grandson.  He will resume

medical treatment with his cardiologist, Dr. Derrick Ridley at Hampton Roads

Cardiology in Hampton, Virginia.  This release plan is safer for Mr. Casey—if he is

released to home confinement immediately, he is less likely to contract COVID-19 than

he would be in prison.  He will be returning to his home in Poquoson, Virginia, where he

can self-isolate and avoid getting sick.  This release plan is also safer for the community.

If Mr. Casey contracts COVID-19 in prison, not only will he likely die, but he will also

---

not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

[34] *See United States v. Redd*, 2020 WL 1248493, at *10 (E.D. Va. Mar. 16, 2020); see also United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, p. 30 (Dec. 2017) ("Among offenders released younger than age 21, 67.6 percent were rearrested compared to 13.4 percent of those released age 65 or older).

likely spread the disease to other inmates and staff members, who will in turn, further the spread in the community.  Moreover, because he is extremely high-risk, in the event that he contracts the disease in prison, he will likely require intensive medical treatment, that could otherwise be used by someone else.  All of this can be avoided if he is released to home confinement right now.

### VI.    Position of the United States

Defense counsel contacted counsel for the United States inquiring as to its position on this motion.  Assistant United States Attorney Eric Hurt advised that the United States reserves its right to state its position after reading and reviewing this motion. However, the United States objects to the defense argument that exhaustion requirements should be waived.

### CONCLUSION

For the reasons set forth above, counsel for Mr. Casey moves the Court to order his immediate compassionate release and permit him to serve the remainder of his sentence on home confinement as a condition of supervised release.  Counsel also respectfully requests expedited briefing given the unique urgency of this situation.

Respectfully submitted,

JAMES R. CASEY

_____/s/_____

Keith Loren Kimball
VSB No. 31046
Supervisory Ass't Federal Public Defender
Attorney for James R. Casey
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510

Telephone: (757) 457-0870
Telefax: (757) 457-0880
Email: keith_kimball@fd.org

## **CERTIFICATE OF SERVICE**

I certify that on this 16th day of April, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification (NEF) to:

Eric Hurt, Esquire
Assistant United States Attorney
Office of the United States Attorney
721 Lakefront Commons, Suite 300
Newport News, Virginia 23606
Email: eric.hurt@usdoj.gov


_____/s/_____
Keith Loren Kimball
VSB No. 31046
Supervisory Ass't Federal Public Defender
Attorney for James R. Casey
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: (757) 457-0870
Telefax: (757) 457-0880
Email: keith_kimball@fd.org